## APPEAL OF PITTSBURGH & BESSEMER COAL CO.

Docket Nos. 5626, 9004.   Decided October 13, 1926.

1. Petitioner was not entitled to classification as a personal service corporation during 1918 and 1919.

2. Evidence *held* insufficient to show that the Commissioner erred in his computation of the profits tax for 1918 under section 328 of the Revenue Act of 1918.

3. Petitioner is entitled to have its profits tax for 1919 computed under the provisions of section 328 of the Revenue Act of 1918.

*H. A. Mihills, C. P. A.*, and *W. D. McBryar, Esq.*, for the petitioner.
*J. Arthur Adams, Esq.*, for the Commissioner.

These appeals involve deficiencies for 1918 and 1919 in the amounts of $10,912.98 and $43,108.63, respectively.   Separate petitions were filed for each year and they were consolidated for hearing and decision.   The petitioner assigns as error on the part of the Commissioner the following:

(1) Failure to classify it as a personal service corporation.

(2) Failure to select proper comparatives when computing its profits tax for 1918 under the provisions of section 328 of the Revenue Act of 1918.

(3) Failure to compute its profits tax for 1919 under the provisions of section 328 of the Revenue Act of 1918.

### FINDINGS OF FACT.

The petitioner is a Pennsylvania corporation organized in 1917. Fred G. Lamb was president and owned all of the stock in 1918, of $5,000 par value; the number of shares outstanding being 100, of the par value of $50 each.   At the time of organization he paid in $750 in cash, and a few months later a stock dividend of $4,250 was declared.

During 1919 one A. S. McQueen purchased certain shares, leaving Lamb the owner of 74 per cent of the entire capital stock.

During 1918 petitioner operated under the regulations of the United States Fuel Administration. In that year all efforts were directed toward securing coal to fill orders received. In 1919 the condition changed and the petitioner's efforts were directed toward securing purchasers for the surplus coal of the several mines from which the petitioner obtained its supply. During 1918 the petitioner's income was derived from commissions on coal sold, which commissions were paid by purchasers. In 1919 its commissions were paid by the producer. Lamb had been in the coal business since 1899. During 1918 and 1919 he was regularly and actively engaged in the conduct of the petitioner's business. A salesman was also employed by the corporation to assist Lamb in negotiations in the purchase and sale of coal and in connection with other work. This employee was not a stockholder. All transactions were approved by Lamb. When McQueen came into the corporation he was made vice president and sales manager and was regularly engaged in the active conduct of the affairs of the corporation. The petitioner maintained branch offices at Columbus and at Cleveland, Ohio, in which branch managers, who were not stockholders, were employed and paid a commission on coal sold.

Petitioner's operations in the purchase and sale of coal were conducted in such a way as to have the terms of sale provide for payment for coal prior to the date on which it was required to pay the operator therefor. The terms were that purchasers should pay on the 10th of the following month, and petitioner arranged to pay the operator for the coal on the 25th. There were some exceptions to this rule. When coal was shipped by petitioner on orders of the Fuel Administration it required consignees to pay in advance, or give security for the payment of the coal shipped, in cases in which the petitioner was not thoroughly satisfied with the financial responsibility of the consignees.

In 1919 operations, in so far as they related to payments for coal, were practically the same as in 1918, but consumers were slower in making payments.

Petitioner owned no mines. It was not a producer of coal, directly or indirectly. It kept no inventory of coal on hand, except in so far as it was necessary during 1918 to accumulate cargoes at Lake ports for shipment under orders of the Fuel Administration. The company did not buy coal for speculation. It had contracts with producing companies, but coal was ordered when a purchaser was found. Contracts were made with mines whereby petitioner agreed to take upon itself the duties of distributing and selling the entire output. Subsequent to 1918, when it was no longer possible to

require purchasers to pay petitioner's commissions, arrangements were made with the coal companies to pay the same. During 1918 petitioner's commission was 15 cents a ton, and during 1919 the commission was upon the basis of a certain percentage of the price at which the coal was sold.

In 1918, Lamb negotiated with persons desiring coal and they sent orders to petitioner for the amount of coal desired, agreeing, at the same time, to pay petitioner a commission. In 1919 the demand for coal was not great and it was necessary for petitioner to find purchasers, to meet competition in this line and to sell the coal to the best possible advantage. Petitioner did not order shipment of coal unless it had first secured an order from the consumer. During 1918 all shipments were upon orders to the petitioner from the consumer and from the petitioner to the operator, substantially as follows:

> Pittsburgh & Bessemer Coal Company:
> Please furnish the following and ship promptly via * * * 10 Cars Run of Mine Coal at $2.45 per net ton, f. o. b. mine.
> We hereby appoint you agent to purchase 10 cars R/M coal and allow you $.15 per ton commission for your services.

Such orders were frequently given by telephone and later confirmed in writing. Upon the receipt of such orders petitioner mailed written order to one of the various mines with which it had contracts " to ship for our account " the quantity of coal specified, to the person from whom it had received the order. Such orders to the mines specified the price per ton and stated " Shipping notices and invoices to this office only. Terms: Net cash, 10 days after receipt of invoice," or " Net cash on 25th of month following shipment."

During 1918 petitioner purchased coal principally from the Four States Coal Co., the Kehota Mining Co., the Paul Coal & Supply Co., the Export Coal Co., and the Locust Hill Coal Co. Lamb was a stockholder, secretary treasurer, and a member of the board of directors of the Export Coal Co. and a stockholder in the Paul Coal & Supply Co., and he acted in an advisory capacity to the Four States Coal Co. He had no connection with the other two mining companies.

In 1918 petitioner obligated itself to pay the mine for the coal shipped on its order, and in 1919 it guaranteed the payment under its contract with the producer for all coal shipped. The producer did not concern itself with the matter of whether the person to whom the petitioner had sold the coal paid his bill or not.

Bills were rendered by petitioner to the purchaser and all payments were made by such purchaser to it. Petitioner endeavored to make collection from the purchaser prior to the date upon which it was required to pay the producer, but such payments by consumers were not always received by petitioner before it was required to pay for the coal shipped upon its order.

On April 1, 1919, petitioner entered into a contract with the Short Creek Coal Co., whereby the petitioner became the exclusive sales agent of the coal company for the distribution of its entire product. The coal company agreed to turn over to petitioner all pending inquiries, orders, and agreements for the purchase of coal received or secured by the coal company and to pay petitioner the commission hereinafter mentioned on all such orders or agreements should petitioner accept or conclude the same. Petitioner agreed to sell the coal at " the best market prices obtainable therefor and at not less than such as shall be fixed from time to time " by the coal company. The agreement further provided:

Upon all sales made by the Pittsburgh Company pursuant to this agreement, the Short Creek Company agrees to pay the Pittsburgh Company, and the Pittsburgh Company agrees to accept, compensation for its services therein on the following basis, viz:—for all coal sold by the Pittsburgh Company where the purchaser pays less than $2.00 per ton, a commission of 4% of the selling price, and where the price is $2.00 per ton and over, a commission of 5% of such selling price.

Upon all sales made by the Short Creek Company prior to said April 1, 1919, calling for delivery of coal after said April 1, 1919, if the orders or agreements covering such sales are acceptable to the Pittsburgh Company, the same shall be taken over by the Pittsburgh Company, as of said April 1, 1919, the compensation of the Pittsburgh Company in all such cases, however, to be a commission of 2% of the selling price upon all coal delivered under such orders or agreements on and after said April 1, 1919.

All such sales are to be made for the account of the Short Creek Company in such amounts, for such deliveries and at such prices as shall be from time to time approved by the Short Creek Company and the coal so sold shall be invoiced to all purchasers thereof in the name of the Pittburgh Company and payment for the same shall in every case be made to the Pittsburgh Company by the purchasers of the coal. This condition as to payment shall be stated in all coal sales agreements made by the Pittsburgh Company pursuant hereto.

The Pittsburgh Company hereby guarantees to the Short Creek Company all accounts for coal sold by the Pittsburgh Company under the terms of this agreement and the Pittsburgh Company agrees to make payment monthly to the Short Creek Company on the 25th day of each month for all coal delivered to the purchasers thereof during the preceding month, less the commissions to which the Pittsburgh Company shall be entitled pursuant hereto in respect of the coal so delivered, it being provided, however, that in every case where any purchaser of the said coal refuses to pay any invoice of the Pittsburgh Company or retains a portion of any amount due under such invoice or invoices claiming an offset or counterclaim by reason of a poor quality or other defect in the coal delivered or by reason of poor deliveries or other causes beyond the control of the Pittsburgh Company, the Short Creek Company will thereupon reimburse the Pittsburgh Company for such amounts in dispute, the Pittsburgh Company agreeing to undertake the adjustment and settlement of such differences under the direction and subject to the control of the Short Creek Company, but at the cost and expense of the Short Creek Company.

The said payments to be made by the Pittsburgh Company to the Short Creek Company shall be based upon and governed by the weights of the coal

as determined by the railroads which weights as reported by the railroad or railroads to the Short Creek Company shall be promptly furnished by the Short Creek Company to the Pittsburgh Company. The moneys payable by the Pittsburgh Company to the Short Creek Company under this paragraph are in no sense advances but are payments for coal delivered by the Short Creek Company.

The contract was for a period of six years, subject to cancellation under certain circumstances. Similar agreements were entered into with the Locust Hill Coal Co., the Pine Bluff Coal Co., the Export Coal Co., the Kehota Mining Co., and others.

Subsequent to the effective date of the above-mentioned contracts, petitioner secured orders for various quantities of coal at varying prices to be shipped over such period as was desired by the purchaser. These orders were in the following form:

Pittsburgh & Bessemer Coal Co.,
   Pittsburgh, Pa.

Memorandum Agreement between Roberts & White * * * hereinafter * * * referred to as "Buyer" and the Export Coal Company * * * hereinafter * * * referred to as "Seller", by which the buyer hereby purchases and agrees to receive and pay for, and the seller hereby sells and agrees to ship from its mines * * * the quantity and grade or grades of coal hereinafter stated upon the terms and subject to the conditions following; * * * It is further * * * agreed * * * that all coal shipped pursuant hereto shall be invoiced by the Pittsburgh & Bessemer Coal Company to which company payment for the coal shall be made. * * *

These agreements were signed by the purchaser and the petitioner, as sales agent, and were approved by the president of the producing company.

The petitioner's income and deductions as shown by its return for 1918 were as follows:

Gross income:
| | | |
|---|---|---|
| Gross sales | | $2,457,318.82 |
| Cost of goods sold | | 2,326,477.98 |
| | | 130,840.84 |

Deductions:
| | | |
|---|---|---|
| Compensation of officers | $15,700.00 | |
| Nonofficers salaries and labor | 9,856.07 | |
| Agents' commissions | 12,787.34 | |
| Rent | 2,355.00 | |
| Interest | 6,879.41 | |
| Worthless debts | 500.10 | |
| Exhaustion, wear and tear | 711.46 | |
| | | 48,789.33 |

  Net income _____ 82,051.51

The income and deductions as shown by the return for 1919 were as follows:

Gross income:

| | |
|---|---:|
| Commissions | $100, 555. 65 |
| Interest on U. S. obligations | 1, 146. 79 |
| Interest from other sources | 2, 455. 25 |
| | 104, 157. 69 |

Deductions:

| | | |
|---|---:|---:|
| Ordinary and necessary expenses, commissions, salaries, rent, etc | $34, 519. 61 | |
| Officers salaries | 27, 616. 62 | |
| Interest paid | 5, 720. 18 | |
| Taxes | 706. 05 | |
| Exhaustion, wear and tear | 923. 27 | |
| | | 69, 485. 73 |
| Net income | | 34, 671. 96 |

The balance sheets at the beginning and the end of the years 1918 and 1919 were as follows:

1918.

| | Jan. 1, 1918. | Jan. 1, 1919. |
|---|---:|---:|
| **ASSETS.** | | |
| Furniture and fixtures | $241. 44 | $4, 031. 62 |
| Cash | 14, 002. 04 | 20, 202. 06 |
| Bills and accounts receivable | 62, 995. 26 | 268, 473. 29 |
| Liberty bonds | 25, 000. 00 | 75, 000. 00 |
| Unadjusted assets | | 713. 60 |
| | 102, 238. 74 | 368, 420. 57 |
| **LIABILITIES.** | | |
| Capital stock | 5, 000. 00 | 5, 000. 00 |
| Accounts payable | 59, 930. 25 | 165, 438. 63 |
| Bills payable | | 83, 500. 00 |
| Other liabilities | | 10, 216. 46 |
| Surplus | 37, 308. 49 | 104, 265. 48 |
| | 102, 238. 74 | 368, 420. 57 |

1919.

| | Jan. 1, 1919. | Jan. 1, 1920. |
|---|---:|---:|
| **ASSETS.** | | |
| Furniture and fixtures | $4, 031. 62 | $4, 753. 39 |
| Cash | 20, 202. 06 | 54, 444. 31 |
| Bills and accounts receivable | 268, 473. 29 | 351, 681. 66 |
| Liberty bonds | 75, 000. 00 | 79, 300. 00 |
| Unadjusted assets | 713. 60 | |
| Securities | | 8, 700. 00 |
| | 368, 420. 57 | 498, 879. 36 |
| **LIABILITIES.** | | |
| Capital stock | 5, 000. 00 | 5, 000. 00 |
| Accounts payable | 165, 438. 62 | 279, 350. 35 |
| Bills payable | 83, 500. 00 | 100, 000. 00 |
| Other liabilities | 10, 216. 46 | |
| Suspense account | | 3, 758. 85 |
| Surplus | 104, 265. 48 | 110, 770. 16 |
| | 368, 420. 57 | 498, 879. 36 |

" Bills and Accounts Receivable " represents amounts due petitioner for coal sold; "Accounts Payable " represents amounts due from petitioner to coal companies; " Bills Payable " represents amounts borrowed by the petitioner to pay coal companies for coal shipped before payment had been received from the purchasers.

During the year 1918 petitioner borrowed the following amounts on its notes:

| | |
|---|---:|
| Dec. 26, 1917 (carried over), demand | $7,500.00 |
| Feb. 2, 1918, demand | 20,000.00 |
| Apr. 29, demand | 5,000.00 |
| May 15, demand | 8,000.00 |
| June 15, demand | 13,750.00 |
| Aug. 16, demand | 3,000.00 |
| July 22, 60-days | 25,000.00 |
| July 30, 60-days | 30,000.00 |
| July 15, demand | 18,750.00 |
| Aug. 20, demand | 9,439.27 |
| Aug. 27, 30-days | 50,000.00 |
| Aug. 27, demand | 19,677.33 |
| Sept. 25, 30-days | 25,000.00 |
| Sept. 25, 30-days | 9,629.56 |
| | ————$252,246.16 |

Amounts borrowed on notes during 1919 were as follows:

| | |
|---|---:|
| Mar. 1, 1919, demand | $3,000.00 |
| Mar. 10, demand | 18,500.00 |
| May 6, demand | 65,000.00 |
| May 29, 60-days | 34,650.51 |
| Sept. 26, demand | 5,000.00 |
| Oct. 20, 90-days | 10,000.00 |
| June 25, 60-days | 25,438.27 |
| June 13, 60-days | 34,650.51 |
| | ————$196,239.29 |

The ratio of profits tax determined by the Commissioner for 1918 under the provisions of section 328 of the Revenue Act of 1918 to net income for that year was 46.39 per cent.

Upon consideration of petitioner's application for assessment of its profits tax for 1919, under the provisions of section 328, the Commissioner held that the comparison of petitioner with other representative concerns failed to disclose that the computation of its profits tax under section 301 imposed upon it an exceptional hardship within the purview of section 327 of the Revenue Act of 1918.

During 1918 the W. C. Atwater Co., of New York, the White Oak Coal Co. of Mount Hope, W. Va., the Pittsburgh & Ohio Mining Co., of Cleveland, Ohio, and the Crozer Pocahontas Co., of Pennsylvania, all corporations, were engaged in selling coal. The invested capital,

total sales, net taxable income, etc., of these corporations and the petitioner were as follows:

| | W. C. Atwater & Co. | White Oak Coal Co. | Pittsburgh & Ohio Mining Co. | Crozer Pocahontas Co. | Pittsburgh & Bessemer Coal Co. |
|---|---|---|---|---|---|
| 1. Invested capital | $744, 354. 62 | $562, 699. 32 | $411, 348. 33 | $397, 726. 14 | $42, 308. 49 |
| 2. Total sales | 8, 116, 252. 42 | 4, 527, 188. 31 | 6, 236, 445. 43 | 4, 766, 264. 86 | 2, 457, 192. 90 |
| 3. Net taxable income | 203, 616. 37 | 130, 497. 56 | 79, 639. 25 | 55, 342. 50 | 82, 051. 51 |
| 4. Income tax | 16, 580. 36 | 8, 582. 10 | 5, 840. 85 | 5, 591. 66 | 5, 037. 67 |
| 5. Profits tax | 61, 481. 31 | 56, 982. 10 | 28, 408. 54 | 6, 589. 32 | 38, 070. 96 |
| 6. Turnover (times) | 10. 9 | 8 | 15. 16 | 12. 5 | |
| 7. Ratio of income to invested capital (per cent) | 27. 3 | 23. 2 | 19. 3 | 14. 6 | 193. 94 |
| 8. Ratio of income to sales (per cent) | 2. 5 | 2. 9 | 1. 28 | 1. 16 | 3. 34 |
| 9. Ratio of profits tax to income (per cent) | 30. 2 | 43. 66 | 35. 66 | 11. 09 | 48. 39 |

W. C. Atwater & Co. of New York was engaged in selling coal as a jobber upon a commission from the coal fields of Virginia, West Virginia, and Kentucky. Its rate of commission is not shown. Its tax liability for 1918 as determined by the Commissioner has been agreed to, except in so far as it may be affected by the tax liability for 1917 yet to be determined.

The White Oak Coal Co. was a subsidiary of twenty other corporations, all of which were producing companies. Its tax liability for 1918 has not yet been finally determined.

The Pittsburgh & Ohio Mining Co. was engaged in selling coal, coke and kindred commodities. Forty per cent of its operations consisted of purchasing a supply of coal and coke and selling the same at the best possible price. Sixty per cent of its operations consisted of selling coal upon commission, the amount of which is not disclosed. This company owned all the stock of another corporation and its tax for 1918 was computed upon the basis of a consolidated return.

The Crozer Pocahontas Co. was engaged in selling coal upon the basis of a commission of 10 cents a ton. The stockholders of the seven coal companies, the output of which the Crozer Pocahontas Co. sold, owned all of its stock.

### OPINION.

LITTLETON: We are of the opinion from the evidence that petitioner was not entitled to be classified as a personal service corporation during 1918 and 1919, for the reason that capital was necessary and was used in the business, and was a material factor in producing its income. It made contracts with a number of producing companies to sell all or a large proportion of their output and to pay for all coal shipped on its order from the 20th to the 25th of the month following shipment. During 1918 petitioner obligated itself to pay the producer for all coal shipped. During 1919 the

petitioner, by the terms of its contracts, guaranteed payment to the producer for all coal sold by petitioner. The producer looked to the petitioner for payment and was not concerned with the matter whether the consignee ever paid the petitioner.

Through the knowledge and experience of its president and principal stockholder, the petitioner was to a large extent enabled to make collection from those to whom it sold coal before it was required to pay the producer from which it purchased the same. This was not always true, however, and it was necessary for petitioner to borrow large sums of money from time to time in order to make payments to the producers for coal shipped. Petitioner was not merely a sales representative. It received no profit unless the purchaser paid it for the coal, and it sustained all losses in connection with failure of the consumers to pay for coal shipped to them.

We think the fact that petitioner was enabled to carry on its operations to a large extent by requiring purchasers of coal to pay it before it was required to pay the producer is not proof that it was a personal service corporation. When a person indebted to petitioner did not make payment or was late in doing so, petitioner either used its surplus cash or borrowed sufficient funds with which to pay for the coal which it had sold. We are of the opinion that capital was a material income-producing factor. *Appeal of C. N. Merritt & Brother, Inc.*, 1 B. T. A. 927; *Appeal of Cleveland & Western Coal Co.*, 4 B. T. A. 93.

We are not convinced from the evidence that the comparatives used by the Commissioner in determining the profits tax for 1918 were improper, nor can we say, under all the facts and circumstances, that the four corporations submitted as comparatives were similarly circumstanced within the meaning of section 328 of the Revenue Act of 1918.

We are of opinion that petitioner has brought itself within the provisions of the first sentence of section 327 (d) of the Revenue Act of 1918, and is therefore entitled to have its profits tax for 1919 computed under the provisions of section 328 of that Act.

*Judgment will be entered on 15 days' notice, under Rule 50.*